# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **GENEVA REED-VEAL, ET AL.** | § | |
| *Plaintiff,* | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:15-CV-02232** |
| | § | **(JURY TRIAL REQUESTED)** |
| **BRIAN ENCINIA, ET AL.,** | § | |
| *Defendants.* | § | |

## DEFENDANTS RAFAEL ZUNIGA, MICHAEL SERGES, DORMIC SMITH, CYNTHIA WHIDDEN, AND MATTHEW MILLS' MOTION FOR SUMMARY JUDGMENT

**TO THE HONORABLE JUDGE OF SAID COURT:**

COME NOW **RAFAEL ZUNIGA**, **MICHAEL SERGES**,[1] **DORMIC SMITH**, **CYNTHIA WHIDDEN**, and **MATTHEW MILLS** (collectively "Defendants"), file this their Motion for Summary Judgment, and would respectfully show unto the Court as follows:

## I.
### INTRODUCTION

Plaintiff Geneva Reed-Veal ("Plaintiff" or "Reed-Veal") is the mother of Decedent Sandra Bland ("Decedent" or "Bland"). She asserts wrongful death and survival causes of action against Defendants arising from Bland's July 13, 2015 suicide, while detained in the Waller County Jail.

---

[1] Incorrectly named as "Michael Sergis."

Bland was arrested by a state law enforcement officer on Friday, July 10, 2015 for a traffic violation and assault on a public servant. Defendants had no involvement in the stop, Bland's arrest, or her transport to the Waller County Jail. Defendants have no personal knowledge of the events that led to Bland being arrested and transported to the jail.

Defendants Zuniga, Serges, Smith, and Whidden were jailers on duty when Bland was found hanging in her cell. Defendant Mills was the controller on duty when Bland was found hanging in her cell. As set forth below, some of these Defendants had interaction with Bland during her detention, and others did not. However, none of them had responsibility for screening Bland for potential suicide risks, and none of them had knowledge of Bland's medical or mental health history, any requests for medical or mental health treatment, or any possible need for medical or mental health treatment. None of them observed Bland doing or saying anything which caused them to believe Bland suffered from any mental health issues, or that she was depressed, suicidal, or a danger to herself. Accordingly, they were not deliberately indifferent to Bland's rights.

Legally, Plaintiff asserts section 1983 claims against Defendants for alleged violations of Bland's Fourteenth Amendment rights. More specifically, Plaintiff accuses them of failing to properly monitor Bland, to prevent her suicide, and to provide medical or mental health treatment. In light of the undisputed evidence,

however, Defendants did not violate Bland's rights, and Defendants are entitled to qualified immunity. With respect to Plaintiff's negligence claims, Defendants' immunity has not been waived. Accordingly, summary judgment is appropriate.

## II.
### ISSUES PRESENTED

1. Whether Defendants violated Bland's rights.

2. Whether Defendants are entitled to qualified immunity.

3. Whether Defendants' immunity has been waived for negligence claims.

## III.
### UNDISPUTED MATERIAL FACTS

### A.    *General Facts Relevant to this Lawsuit*

For context, Defendants incorporate the undisputed material facts from County Defendants' Motion for Summary Judgment, including the evidence cited therein and attached thereto.[2]

### B.    *Rafael Zuniga's Involvement*

Rafael Zuniga is a jailer with the Waller County Sheriff's Office.[3] His job duties include securing the facility, performing security checks on detainees, distributing meals to detainees, escorting detainees to and from variations locations—i.e., to see a magistrate judge or go to recreation—and responding to

---

[2] *See* Document No. 39.
[3] *See* Exhibit X (Zuniga Affidavit).

detainee requests/issues.[4]  Zuniga first interacted with Bland when he began his shift at 7:00 a.m. on Saturday, July 11, 2015.[5]  He and other jailers allowed her to use the phone at the booking desk that morning, in an attempt to find someone to help her get out of jail, which was normal.[6]  After the magistrate judge set Bland's bail, Zuniga observed Bland briefly crying, which was also fairly common in jail.[7]  At dinner time on Saturday (approximately 5:00 p.m.), Bland did not accept a hot tray of food; however, she accepted a sack lunch, which is also fairly common.[8]  During his shift on Saturday, Zuniga did not observe Bland doing or saying anything which caused him to believe Bland suffered from any mental health issues, or that she was depressed, suicidal, or a danger to herself.[9]  Zuniga's shift ended at 7:00 p.m. on Saturday, July 11, 2015.[10]

Zuniga also worked on Sunday, July 12, 2015, again beginning his shift at 7:00 a.m.[11]  During this shift, Zuniga observed Bland talking to other female detainees in the cell across the hall from her.[12]  Bland requested to use the booking desk phone on several occasions.[13]  However, because Bland had already been allowed to make several free phone calls from the booking desk, and because

---

[4] *See* Exhibit X (Zuniga Affidavit).
[5] *See* Exhibit X (Zuniga Affidavit).
[6] *See* Exhibit X (Zuniga Affidavit).
[7] *See* Exhibit X (Zuniga Affidavit).
[8] *See* Exhibit X (Zuniga Affidavit).
[9] *See* Exhibit X (Zuniga Affidavit).
[10] *See* Exhibit X (Zuniga Affidavit).
[11] *See* Exhibit X (Zuniga Affidavit).
[12] *See* Exhibit X (Zuniga Affidavit).
[13] *See* Exhibit X (Zuniga Affidavit).

Bland had access to a phone in her cell from which she could make unlimited collect calls, she was not permitted to make any additional calls from the booking desk on Sunday, July 12, 2015.[14]  Zuniga observed Bland accept a sack lunch on Sunday, and she did not appear to be refusing to eat.[15]  During his shift on Sunday, Zuniga did not observe Bland doing or saying anything which caused him to believe Bland suffered from any mental health issues, or that she was depressed, suicidal, or a danger to herself.[16]  Zuniga's shift ended at 7:00 p.m. on Sunday, July 12, 2015.[17]

Zuniga's next shift began at 7:00 a.m. on Monday, July 13, 2015.[18]  He and jailer Michael Serges performed a security check shortly after coming on duty, and they checked on Bland.[19]  She was behaving normally and did not give any indication that she was in distress.[20]  Thereafter, Zuniga began preparing several detainees to be transferred to the Texas Department of Criminal Justice (prison).[21]  Zuniga did not perform the security check at 8:00 a.m., and he had no other interaction with Bland before she was found hanging in her cell.[22]

---

[14] *See* Exhibit X (Zuniga Affidavit).
[15] *See* Exhibit X (Zuniga Affidavit).
[16] *See* Exhibit X (Zuniga Affidavit).
[17] *See* Exhibit X (Zuniga Affidavit).
[18] *See* Exhibit X (Zuniga Affidavit).
[19] *See* Exhibit X (Zuniga Affidavit).
[20] *See* Exhibit X (Zuniga Affidavit).
[21] *See* Exhibit X (Zuniga Affidavit).
[22] *See* Exhibit X (Zuniga Affidavit).

At approximately 9:00 a.m., while Zuniga and the other jailers were performing security checks, jailer Cynthia Whidden discovered Bland was hanging in her cell.[23]  Zuniga was standing next to Whidden, and she immediately used Zuniga's radio to request that the door to Bland's cell be opened, and controller Matthew Mills opened the cell door.[24]  The controller also notified EMS.[25]

Whidden and Zuniga immediately entered the cell, and other jail personnel also responded.[26]  Zuniga observed Bland was nonresponsive and hanging from a partition in the cell, with a trash bag being used as a ligature around her neck.[27]  He immediately began loosening the knot in the ligature around Bland's neck, and Lieutenant Rochen arrived within a few seconds and helped lift Bland up so that they could remove the ligature.[28]  Upon freeing Bland from the ligature, the jailers laid Bland on the floor of the cell, and Lieutenant Rochen began administering CPR to Bland.[29]  Lieutenant Rochen continued administering CPR until she was relieved by Deputy Randy Lewis, and Lewis administered CPR until EMS personnel arrived and took over providing medical care to Bland.[30]  EMS personnel pronounced Bland dead shortly thereafter.[31]

[23] *See* Exhibit X (Zuniga Affidavit).
[24] *See* Exhibit X (Zuniga Affidavit).
[25] *See* Exhibit X (Zuniga Affidavit).
[26] *See* Exhibit X (Zuniga Affidavit).
[27] *See* Exhibit X (Zuniga Affidavit).
[28] *See* Exhibit X (Zuniga Affidavit).
[29] *See* Exhibit X (Zuniga Affidavit).
[30] *See* Exhibit X (Zuniga Affidavit).
[31] *See* Exhibit X (Zuniga Affidavit).

Zuniga had no knowledge of Bland's medical or mental health history, any requests for medical or mental health treatment, or any possible need for medical or mental health treatment.[32] When he observed Bland during his shifts, she did not appear to suffer from any mental health issues, and she did not appear to be depressed or sad, or to be contemplating suicide.[33] At no point during her detention did he perceive her to be a suicide risk.[34] Zuniga was never subjectively aware of any alleged serious risk of harm to Bland, and he was not deliberately indifferent to any alleged serious risk of harm to Bland.[35]

## C.  *Michael Serges' Involvement*

Michael Serges is a jailer with the Waller County Sheriff's Office.[36] His job duties include securing the facility, performing security checks on detainees, distributing meals to detainees, escorting detainees to and from variations locations—i.e., to see a magistrate judge or go to recreation—and responding to detainee requests/issues.[37] Serges first interacted with Bland when he began his shift at 7:00 a.m. on Saturday, July 11, 2015.[38] He and other jailers allowed her to use the phone at the booking desk that morning, in an attempt to find someone to

---

[32] *See* Exhibit X (Zuniga Affidavit).
[33] *See* Exhibit X (Zuniga Affidavit).
[34] *See* Exhibit X (Zuniga Affidavit).
[35] *See* Exhibit X (Zuniga Affidavit).
[36] *See* Exhibit Y (Serges Affidavit).
[37] *See* Exhibit Y (Serges Affidavit).
[38] *See* Exhibit Y (Serges Affidavit).

help her get out of jail, which was normal.[39]  After the magistrate judge set Bland's

bail, Serges observed Bland briefly crying, which was also fairly common in jail.[40]

During his shift on Saturday, Serges did not observe Bland doing or saying

anything which caused him to believe Bland suffered from any mental health

issues, or that she was depressed, suicidal, or a danger to herself.[41]  Serges' shift

ended at 7:00 p.m. on Saturday, July 11, 2015.[42]

Serges also worked on Sunday, July 12, 2015, again beginning his shift at

7:00 a.m.[43]  During this shift, Serges observed Bland not taking her hot food tray;

however, she always took a sack lunch.[44]  That was not unusual.[45]  However,

Serges wanted to make sure she was getting enough to eat, and he asked Bland if

she was "okay."[46]  She responded, "I'm good."[47]  Later that day, he observed

Bland talking to other detainees in the cell across the hall from her cell.[48]  During

his shift on Sunday, Serges did not observe Bland doing or saying anything which

caused him to believe Bland suffered from any mental health issues, or that she

---

[39] *See* Exhibit Y (Serges Affidavit).
[40] *See* Exhibit Y (Serges Affidavit).
[41] *See* Exhibit Y (Serges Affidavit).
[42] *See* Exhibit Y (Serges Affidavit).
[43] *See* Exhibit Y (Serges Affidavit).
[44] *See* Exhibit Y (Serges Affidavit).
[45] *See* Exhibit Y (Serges Affidavit).
[46] *See* Exhibit Y (Serges Affidavit).
[47] *See* Exhibit Y (Serges Affidavit).
[48] *See* Exhibit Y (Serges Affidavit).

was depressed, suicidal, or a danger to herself.[49]  Serges' shift ended at 7:00 p.m. on Sunday, July 12, 2015.[50]

Serges' next shift began at 7:00 a.m. on Monday, July 13, 2015.[51]  He and jailer Rafael Zuniga performed a security check shortly after coming on duty, and they checked on Bland.[52]  She was behaving normally and did not give any indication that she was in distress.[53]  When Serges asked her if she was alright, she responded, "I'm good."[54]  Thereafter, Serges began preparing several detainees to be transferred to the Texas Department of Criminal Justice (prison).[55]  Serges did not perform the security check at 8:00 a.m., and he had no other interaction with Bland before she was found hanging in her cell.[56]

At approximately 9:00 a.m., while Serges and the other jailers were performing security checks, he heard jailer Cynthia Whidden alert jail personnel that a detainee was hanging in her cell.[57]  Serges immediately went to where jailer Whidden was located.[58]

When Serges arrived, immediately behind Whidden and Zuniga, he observed Bland was nonresponsive and hanging from a partition in the cell, with a trash bag

---

[49] *See* Exhibit Y (Serges Affidavit).
[50] *See* Exhibit Y (Serges Affidavit).
[51] *See* Exhibit Y (Serges Affidavit).
[52] *See* Exhibit Y (Serges Affidavit).
[53] *See* Exhibit Y (Serges Affidavit).
[54] *See* Exhibit Y (Serges Affidavit).
[55] *See* Exhibit Y (Serges Affidavit).
[56] *See* Exhibit Y (Serges Affidavit).
[57] *See* Exhibit Y (Serges Affidavit).
[58] *See* Exhibit Y (Serges Affidavit).

being used as a ligature around her neck.[59]  He and Zuniga immediately began loosening the knot in the ligature around Bland's neck, and Lieutenant Rochen arrived within a few seconds and helped lift Bland up so that they could remove the ligature.[60]  Upon freeing Bland from the ligature, the jailers laid Bland on the floor of the cell, and Lieutenant Rochen began administering CPR to Bland.[61] Lieutenant Rochen continued administering CPR until she was relieved by Deputy Randy Lewis, and Lewis administered CPR until EMS personnel arrived and took over providing medical care to Bland.[62]  EMS personnel pronounced Bland dead shortly thereafter.[63]

Serges had no knowledge of Bland's medical or mental health history, any requests for medical or mental health treatment, or any possible need for medical or mental health treatment.[64]  When he observed Bland during his shifts, she did not appear to suffer from any mental health issues, and she did not appear to be depressed or sad, or to be contemplating suicide.[65]  At no point during her detention did he perceive her to be a suicide risk.[66]  Serges was never subjectively

---

[59] *See* Exhibit Y (Serges Affidavit).
[60] *See* Exhibit Y (Serges Affidavit).
[61] *See* Exhibit Y (Serges Affidavit).
[62] *See* Exhibit Y (Serges Affidavit).
[63] *See* Exhibit Y (Serges Affidavit).
[64] *See* Exhibit Y (Serges Affidavit).
[65] *See* Exhibit Y (Serges Affidavit).
[66] *See* Exhibit Y (Serges Affidavit).

aware of any alleged serious risk of harm to Bland, and he was not deliberately indifferent to any alleged serious risk of harm to Bland.[67]

## D. *Dormic Smith's Involvement*

Dormic Smith is a jailer with the Waller County Sheriff's Office.[68] His job duties include securing the facility, performing security checks on detainees, distributing meals to detainees, escorting detainees to and from variations locations—i.e., to see a magistrate judge or go to recreation—and responding to detainee requests/issues.[69] Smith first interacted with Bland when he began his shift at 7:00 a.m. on Saturday, July 11, 2015.[70] After he took her to see a magistrate judge to have her bail set, he allowed her to make several free phone calls at the booking desk, in an attempt to find someone to help her get out of jail, which was normal.[71]

Bland attempted to call a male friend first, and she left a message when no one answered.[72] Bland thereafter made telephone contact with her sister, but Bland stated that her sister would not bail her out of jail.[73] Next, Bland tried to reach the same male friend she initially called.[74] The phone range only once or twice before

---

[67] *See* Exhibit Y (Serges Affidavit).
[68] *See* Exhibit Z (Smith's Second Affidavit). Smith submitted a prior affidavit with Waller County's Motion for Summary Judgment, prior to any claims being asserted against him.
[69] *See* Exhibit Z (Smith's Second Affidavit).
[70] *See* Exhibit Z (Smith's Second Affidavit).
[71] *See* Exhibit Z (Smith's Second Affidavit).
[72] *See* Exhibit Z (Smith's Second Affidavit).
[73] *See* Exhibit Z (Smith's Second Affidavit).
[74] *See* Exhibit Z (Smith's Second Affidavit).

going to voicemail, and it was apparent from Bland's behavior that she perceived (as did Smith) that this individual was screening or ignoring Bland's calls.[75] At that time, Bland appeared frustrated and began crying, which was not unusual in jail.[76] During his shift on Saturday, Smith did not observe Bland doing or saying anything which caused him to believe Bland suffered from any mental health issues, or that she was depressed, suicidal, or a danger to herself.[77] Smith's shift ended at 7:00 p.m. on Saturday, July 11, 2015.[78]

Smith also worked on Sunday, July 12, 2015, again beginning his shift at 7:00 a.m.[79] During this shift, Smith was playing "church music" on the computer, and Bland asked what time church started.[80] Smith responded by advising Bland that church in jail was on Saturday, which appeared to frustrate Bland.[81] Bland also asked Smith if she could use the booking desk phone, and he reminded her that she had already had several free calls, and that she could make unlimited collect calls from within her cell.[82] Bland also complained that the water from the sink in her cell was dirty, and Smith brought her a cup of water from another sink outside her cell.[83] Bland also requested Tylenol, which Smith provided to her.[84]

---

[75] *See* Exhibit Z (Smith's Second Affidavit).
[76] *See* Exhibit Z (Smith's Second Affidavit).
[77] *See* Exhibit Z (Smith's Second Affidavit).
[78] *See* Exhibit Z (Smith's Second Affidavit).
[79] *See* Exhibit Z (Smith's Second Affidavit).
[80] *See* Exhibit Z (Smith's Second Affidavit).
[81] *See* Exhibit Z (Smith's Second Affidavit).
[82] *See* Exhibit Z (Smith's Second Affidavit).
[83] *See* Exhibit Z (Smith's Second Affidavit).
[84] *See* Exhibit Z (Smith's Second Affidavit).

Smith does not recall whether Bland was eating her food or not, but he heard another jailer question Bland about whether she had an appetite or wanted to eat anything.[85]  Although Smith had some concern about her eating, it was not unusual for new detainees to skip some meals, and he knew she was drinking water.[86]  During his shift on Sunday, Smith did not observe Bland doing or saying anything which caused him to believe Bland suffered from any mental health issues, or that she was depressed, suicidal, or a danger to herself.[87]  Smith's shift ended at 7:00 p.m. on Sunday, July 12, 2015.[88]

Smith's next shift began at 7:00 a.m. on Monday, July 13, 2015.[89]  Smith may have participated in the 7:00 a.m. security check with the other jailers, but he does not recall having any specific interaction with Bland.[90]  During the 8:00 a.m. security check, Smith was working the booking desk, and he did not check on Bland.[91]  Although he did not interact with Bland, he heard a female detainee use the intercom to ask the controller to make a free phone call at the booking desk, and he heard the controller explain to the detainee that she should use the phone in her cell.[92]

---

[85] *See* Exhibit Z (Smith's Second Affidavit).
[86] *See* Exhibit Z (Smith's Second Affidavit).
[87] *See* Exhibit Z (Smith's Second Affidavit).
[88] *See* Exhibit Z (Smith's Second Affidavit).
[89] *See* Exhibit Z (Smith's Second Affidavit).
[90] *See* Exhibit Z (Smith's Second Affidavit).
[91] *See* Exhibit Z (Smith's Second Affidavit).
[92] *See* Exhibit Z (Smith's Second Affidavit).

At approximately 9:00 a.m., Smith heard jailer Cynthia Whidden alert jail personnel that a detainee was hanging in her cell.[93] Smith immediately went to where jailer Whidden was located.[94] When Smith arrived at the cell, several other jail personnel were already in the cell and lowering a non-responsive Bland down to the ground.[95] Lieutenant Rochen immediately began administering CPR to Bland, and she continued administering CPR until she was relieved by Deputy Randy Lewis.[96] Lewis administered CPR until EMS personnel arrived and took over providing medical care to Bland.[97] EMS personnel pronounced Bland dead shortly thereafter.[98]

Smith had no knowledge of Bland's medical or mental health history, any requests for medical or mental health treatment, or any possible need for medical or mental health treatment.[99] When he observed Bland during his shifts, she did not appear to suffer from any mental health issues, and she did not appear to be depressed or sad, or to be contemplating suicide.[100] At no point during her detention did he perceive her to be a suicide risk.[101] Smith was never subjectively

[93] *See* Exhibit Z (Smith's Second Affidavit).
[94] *See* Exhibit Z (Smith's Second Affidavit).
[95] *See* Exhibit Z (Smith's Second Affidavit).
[96] *See* Exhibit Z (Smith's Second Affidavit).
[97] *See* Exhibit Z (Smith's Second Affidavit).
[98] *See* Exhibit Z (Smith's Second Affidavit).
[99] *See* Exhibit Z (Smith's Second Affidavit).
[100] *See* Exhibit Z (Smith's Second Affidavit).
[101] *See* Exhibit Z (Smith's Second Affidavit).

aware of any alleged serious risk of harm to Bland, and he was not deliberately indifferent to any alleged serious risk of harm to Bland.[102]

## E. *Cynthia Whidden's Involvement*

Cynthia Whidden is a jailer with the Waller County Sheriff's Office.[103] Her job duties include securing the facility, performing security checks on detainees, distributing meals to detainees, escorting detainees to and from variations locations—i.e., to see a magistrate judge or go to recreation—and responding to detainee requests/issues.[104] Whidden had no interaction with Bland prior to Bland's reported suicide, and Whidden was not even aware Bland was in the jail before that time.[105] Prior to Bland's reported suicide, Whidden had no knowledge of Bland's medical or mental health history, any requests for medical or mental health treatment, or any possible need for medical or mental health treatment.[106]

Whidden was not on duty on Friday, July 10, 2015 through Sunday, July 12, 2015.[107] The first time Whidden was in the jail when Bland was in the jail was when Whidden began her shift at approximately 7:00 a.m. on Monday, July 13, 2015.[108] Whidden did not perform the 7:00 a.m. security check with Jailers Serges

---

[102] *See* Exhibit Z (Smith's Second Affidavit).
[103] *See* Exhibit AA (Whidden Affidavit).
[104] *See* Exhibit AA (Whidden Affidavit).
[105] *See* Exhibit AA (Whidden Affidavit).
[106] *See* Exhibit AA (Whidden Affidavit).
[107] *See* Exhibit AA (Whidden Affidavit).
[108] *See* Exhibit AA (Whidden Affidavit).

and Zuniga because she was performing other duties.[109]  Whidden also did not

perform the 8:00 a.m. security check because she was assisting Jailer Smith at the

booking desk.[110]

At approximately 9:00 a.m., Whidden was checking to see if the detainees

wanted to go to the recreation yard when she discovered Bland hanging in her

cell.[111]  Jailer Zuniga was the closest jailer to her, and Whidden used Zuniga's

radio to advise that a detainee was hanging in her cell, and to request that the cell

door be opened.[112]  When the controller opened the cell door, Whidden entered the

cell and found Bland non-responsive.[113]  Whidden used Zuniga's radio again to

request EMS.[114]

Other jail personnel were arriving at that time—within a few seconds of

Whidden discovering Bland—and the male jailers were attempting to untie the

knot from the ligature around Bland's neck while Lieutenant Rochen lifted Bland's

body.[115]  Upon freeing Bland from the ligature, the jailers laid Bland on the floor of

the cell, and Lieutenant Rochen began administering CPR to Bland.[116]  Lieutenant

Rochen continued administering CPR until she was relieved by Deputy Randy

Lewis, and Lewis administered CPR until EMS personnel arrived and took over

---

[109] *See* Exhibit AA (Whidden Affidavit).
[110] *See* Exhibit AA (Whidden Affidavit).
[111] *See* Exhibit AA (Whidden Affidavit).
[112] *See* Exhibit AA (Whidden Affidavit).
[113] *See* Exhibit AA (Whidden Affidavit).
[114] *See* Exhibit AA (Whidden Affidavit).
[115] *See* Exhibit AA (Whidden Affidavit).

providing medical care to Bland.[117]  EMS personnel pronounced Bland dead shortly thereafter.[118]

Whidden had no knowledge of Bland's medical or mental health history, any requests for medical or mental health treatment, or any possible need for medical or mental health treatment.[119]  Whidden was never subjectively aware of any alleged serious risk of harm to Bland, and she was not deliberately indifferent to any alleged serious risk of harm to Bland.[120]

## F.    *Matthew Mills' Involvement*

Matthew Mills was a controller at the Waller County Jail (he is now a sergeant).[121]  His job duties as a controller included opening and closing secure doors from the control room, watching security cameras at the jail, monitoring and responding to radio communications from jailers, and monitoring and responding to intercom communications from detainees.[122]

Mills first interacted with Bland after his shift began at 7:00 a.m. on Saturday, July 11, 2015.[123]  He received an intercom communication from her requesting to use the booking desk phone, and he opened her cell door for a jailer

---

[116] *See* Exhibit AA (Whidden Affidavit).
[117] *See* Exhibit AA (Whidden Affidavit).
[118] *See* Exhibit AA (Whidden Affidavit).
[119] *See* Exhibit AA (Whidden Affidavit).
[120] *See* Exhibit AA (Whidden Affidavit).
[121] *See* Exhibit BB (Mills Affidavit).
[122] *See* Exhibit BB (Mills Affidavit).
[123] *See* Exhibit BB (Mills Affidavit).

to get her out of her cell to do so.[124]   He was also responsible for opening cell doors when she was taken to and from a magistrate judge to have her bail set, and he observed jailers allowing her to make several phone calls at the booking desk after her bail had been set.[125]   During his shift on Saturday, Mills did not observe Bland doing or saying anything which caused him to believe Bland suffered from any mental health issues, or that she was depressed, suicidal, or a danger to herself.[126]   Mills' shift ended at 7:00 p.m. on Saturday, July 11, 2015.[127]

Mills also worked on Sunday, July 12, 2015, again beginning his shift at 7:00 a.m.[128]   The only interaction Mills had with Bland on Sunday was responding to her intercom communications asking to use the phone at the booking desk.[129] Mills advised her that she could use the phone in her cell to make calls, as she had already been allowed to use the phone at the booking desk numerous times.[130] During his shift on Sunday, Mills did not observe Bland doing or saying anything which caused him to believe Bland suffered from any mental health issues, or that she was depressed, suicidal, or a danger to herself.[131]   Mills' shift ended at 7:00 p.m. on Sunday, July 12, 2015.[132]

---

[124] *See* Exhibit BB (Mills Affidavit).
[125] *See* Exhibit BB (Mills Affidavit).
[126] *See* Exhibit BB (Mills Affidavit).
[127] *See* Exhibit BB (Mills Affidavit).
[128] *See* Exhibit BB (Mills Affidavit).
[129] *See* Exhibit BB (Mills Affidavit).
[130] *See* Exhibit BB (Mills Affidavit).
[131] *See* Exhibit BB (Mills Affidavit).
[132] *See* Exhibit BB (Mills Affidavit).

Mills' next shift began at 7:00 a.m. on Monday, July 13, 2015.[133]  The only interaction Mills had with Bland on Monday was receiving intercom communications from Bland at approximately 8:00 a.m.[134]  She asked to use the phone at the booking desk, and he explained to her that she could not use that phone, but that she could make calls from the phone in her cell.[135]

At approximately 9:00 a.m., Mills received a radio communication from Jailer Cynthia Whidden, advising that a detainee had been found hanging in her cell, and asking him to open the door to cell 95.[136]  He could tell from Whidden's tone that this was an urgent matter, and he immediately opened the cell door.[137]  He also immediately requested EMS to respond to the jail.[138]  He thereafter stayed in the control room and opened doors as necessary so that responding jail personnel and EMS personnel could quickly access the secure areas of the jail.[139]

Mills had no knowledge of Bland's medical or mental health history, any requests for medical or mental health treatment, or any possible need for medical or mental health treatment.[140]  When he observed Bland during his shifts, she did not appear to suffer from any mental health issues, and she did not appear to be

---

[133] *See* Exhibit BB (Mills Affidavit).
[134] *See* Exhibit BB (Mills Affidavit).
[135] *See* Exhibit BB (Mills Affidavit).
[136] *See* Exhibit BB (Mills Affidavit).
[137] *See* Exhibit BB (Mills Affidavit).
[138] *See* Exhibit BB (Mills Affidavit).
[139] *See* Exhibit BB (Mills Affidavit).
[140] *See* Exhibit BB (Mills Affidavit).

depressed or sad, or to be contemplating suicide.[141]  At no point during her

detention did he perceive her to be a suicide risk.[142]  Mills was never subjectively

aware of any alleged serious risk of harm to Bland, and he was not deliberately

indifferent to any alleged serious risk of harm to Bland.[143]

## IV.
### SUMMARY JUDGMENT EVIDENCE

In support of this Motion, Defendants rely on, and incorporate by reference

as if set forth at length herein, all the evidence attached to County Defendants'

Motion for Summary Judgment (Exhibits A through R to Document No. 39), and

the following evidence:

| | | |
|---|---|---|
| Exhibit X | — | Affidavit of Rafael Zuniga; |
| Exhibit Y | — | Affidavit of Michael Serges; |
| Exhibit Z | — | Second Affidavit of Dormic Smith; |
| Exhibit AA | — | Affidavit of Cynthia Whidden; and |
| Exhibit BB | — | Affidavit of Matthew Mills. |

## V.
### SUMMARY JUDGMENT STANDARD

A party in a lawsuit may move a court to enter summary judgment before

trial.  FED. R. CIV. P. 56.  Summary judgment is appropriate when the moving party

establishes that there is no genuine dispute of material fact and/or the moving party

is entitled to judgment as a matter of law.  FED. R. CIV. P. 56; *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322-24 (1986); *Stewart v. Murphy*, 174 F.3d 530, 533 (5th

---

[141] *See* Exhibit BB (Mills Affidavit).

Cir. 1999). "[T]he substantive law will identify which facts are material," and only disputes about those facts will preclude the granting of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is one "that might affect the outcome of the suit under governing law," and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *Smith v. Brenoetty*, 158 F.3d 908, 911 (5th Cir. 1998).

Once the movant meets its burden under Rule 56, the non-movant must designate specific facts showing that there is a genuine dispute for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Conclusive assertions, unsupported by specific facts presented in admissible evidence opposing the motion for summary judgment, are insufficient to defeat a proper motion for summary judgment. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990). The party opposing summary judgment must respond by setting forth specific evidence in the record and articulating the precise manner in which that evidence supports his or her claim. *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994).

---

[142] *See* Exhibit Z (Smith's Second Affidavit).
[143] *See* Exhibit Z (Smith's Second Affidavit).

## VI.
### ARGUMENTS & AUTHORITIES

**A.** **_Section 1983 Failure to Prevent Suicide Claims Fail as a Matter of Law._**

It appears Plaintiff is claiming that Defendants were (1) deliberately indifferent to Bland's alleged serious risk of suicide by failing to adequately monitor her and (2) deliberately indifferent to Bland's serious medical need after she was discovered hanging in her cell. As set forth below, the evidence conclusively establishes Defendants were not deliberately indifferent to any serious risk of suicide or serious medical need. Further, they are entitled to qualified immunity because they did not violate any of Bland's clearly established rights, and their conduct was objectively reasonable.

 i. _No Subjective Awareness of Serious Risk of Suicide._

Bland had a right under the Fourteenth Amendment to the United States Constitution to protection from known suicidal tendencies during her detention. _See Thompson v. Upshur County, Tex.,_ 245 F.3d 447, 457 (5th Cir. 2001); _Jacobs v. West Feliciana Sheriff's Dep't,_ 228 F.3d 388, 393 (5th Cir. 2000); _Nunez v. Deviney,_ 4:06–CV–0579–BE, 2007 WL 2059726, at *2 (N.D. Tex. July 17, 2007) (citing _Hare v. City of Corinth, Miss.,_ 74 F.3d 633, 639 (5th Cir.1996)).

In _Hare,_ the Fifth Circuit adopted the subjective deliberate indifference test for claims of failure to protect from suicide risk. _See Hare v. City of Corinth, Miss.,_ 74 F.3d 633, 647-48 (5th Cir.1996). To establish such a claim, a plaintiff

must establish: (1) that the defendant had subjective knowledge of a substantial and serious risk that the pretrial detainee might commit suicide; and (2) that the defendant nevertheless disregarded the risk of suicide by responding to it with deliberate indifference. *Id.* at 650. In other words, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Jones v. Throckmorton County, Tex.,* 1:02–CV–182–C, 2004 WL 419811, at *4 (N.D. Tex. March 8, 2004) (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)). "An official's failure to alleviate a significant risk that he should have perceived but did not, while not commendable, does not rise to the level of deliberate indifference." *Nunez v. Deviney,* 4:06–CV–0579–BE, 2007 WL 2059726, at *2 (N.D. Tex. July 17, 2007) (citing *Farmer,* 511 U.S. at 838).

### 1. Defendant Cynthia Whidden

In this case, Defendant Whidden was not in the jail when Bland was arrested, and she did not report for work until the morning of her suicide. Whidden was not even aware Bland was in the jail until she found Bland hanging in her cell, and she had no knowledge of Bland's medical or mental health history, any requests for medical or mental health treatment, or any possible need for medical or mental health treatment prior to that time. Whidden also did not observe Bland doing or saying anything which caused her to believe Bland suffered from any

- 23 -

mental health issues, or that she was depressed, suicidal, or a danger to herself Accordingly, Whidden had no subjective awareness that Bland faced any serious risk of suicide, and the circumstances do not support any inference of any such subjective awareness, since she did not interact with Bland during her detention, or have any reason to do so, and when she was not on duty during Bland's detention. For the foregoing reasons, the evidence conclusively establishes that Whidden was not subjectively aware of any serious risk of suicide, defeating Plaintiff's claims against her.

### 2. Defendants Rafael Zuniga, Michael Serges, & Dormic Smith

As set forth above, Defendants Zuniga, Serges, and Smith were jailers on duty on Saturday, Sunday, and Monday. They interacted with Bland, and they provided her with courtesies and assistance on numerous occasions, including allowing her to make free phone calls from the booking desk, bringing her sack lunches when she did not accept hot trays of food, bringing her water when she complained of the water available in her cell, and bringing her medication when requested. They observed her crying after her bail was set, and they observed her become frustrated when her friends and family refused to either take her phone calls or bail her out of jail. However, these issues are not uncommon in jail. They also observed her talking with other detainees, and she always indicated she was fine when asked.

They had no knowledge of Bland's medical or mental health history, any requests for medical or mental health treatment, or any possible need for medical or mental health treatment, other than her one request for medication, which was provided. They also did not observe Bland doing or saying anything which caused them to believe Bland suffered from any mental health issues, or that she was depressed, suicidal, or a danger to herself. Accordingly, they had no subjective awareness that Bland faced any serious risk of suicide, and the circumstances do not support any inference of any such subjective awareness. For the foregoing reasons, the evidence conclusively establishes that Zuniga, Serges, and Smith were not subjectively aware of any serious risk of suicide, defeating Plaintiff's claims against them.

### 3. Defendant Matthew Mills

As set forth above, Defendants Mills was the controller on duty on Saturday, Sunday, and Monday. His only interaction with Bland was opening doors for jailers to take her to and from a magistrate judge, or to use the phone, and responding to her intercom communications. He had no knowledge of Bland's medical or mental health history, any requests for medical or mental health treatment, or any possible need for medical or mental health treatment. He also did not observe Bland doing or saying anything which caused him to believe Bland suffered from any mental health issues, or that she was depressed, suicidal, or a

danger to herself. Accordingly, he had no subjective awareness that Bland faced any serious risk of suicide, and the circumstances do not support any inference of any such subjective awareness. For the foregoing reasons, the evidence conclusively establishes that Mills were not subjectively aware of any serious risk of suicide, defeating Plaintiff's claims against him.

        ii.    *No Deliberate Indifference*.

As set forth above, Defendants were not subjectively aware of any serious risk of suicide. Accordingly, they could not have been deliberately indifferent to any such risk. *See, e.g., Brumfield*, 551 F.3d at 332 (cannot be deliberately indifferent if no known suicide danger).

Further, "[d]eliberate indifference is an extremely high standard to meet." *Domino v. Texas Dept. of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). It must be proven that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* Put another way, a plaintiff must establish more than mere negligence, and even more than gross negligence. *See Hare v. City of Corinth, Miss.,* 74 F.3d 633, 646 (5th Cir. 1996).

In this case, there is no evidence Defendants were deliberately indifferent. More specifically, they responded to each of Bland's requests, and they did not ignore any requests for medical or mental health treatment.

With respect to allegations that jailers failed to check on Bland at the 8:00 security check on Monday, July 13, 2015, the law is clear that the failure to make such a check does not constitute deliberate indifference. *See, e.g., Estate of Pollard v. Hood County*, No. 13-11060, 579 Fed.Appx. 260, 265-66 (5th Cir. Aug. 25, 2014) (not selected for publication) (even if jailers have subjective awareness of suicide risk, there is no fact question on deliberate indifference based on a failure to make all required cell checks). In this case, there is no evidence from which an inference could be drawn that Defendants were deliberately indifferent to any serious risk of suicide, especially when they were not aware of any alleged serious risk of suicide. Accordingly, Plaintiff's claims fail as a matter of law.

iii. *Qualified Immunity – No Violation of Clearly Established Law*.

Defendants are also entitled to qualified immunity on the claim that they failed to prevent Bland's suicide. At the outset, "qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Taylor v. Barkes*, 575 U.S. ---, 135 S.Ct. 2042, 2044 (Jun. 1, 2015). "To be clearly established, a right must be sufficiently clear that every

reasonable official would have understood that what he is doing violates that right." *Id.* As such, "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.*

The United States Supreme Court recently addressed the issue of whether detainees have a clearly established right to the proper implementation of adequate suicide prevention protocols. *See Taylor*, 135 S.Ct. at 2044. That is essentially the issue in this case because, whatever allegations Plaintiff makes, she is arguing that Defendants violated Bland's rights by failing to prevent her suicide. On that issue, the Supreme Court held on June 1, 2015 that there is no such clearly established right:

> No decision of this Court establishes a right to the proper implementation of adequate suicide prevention protocols. No decision of this Court even discusses suicide screening or prevention protocols. And "to the extent that a 'robust consensus of cases of persuasive authority' " in the Courts of Appeals "could itself clearly establish the federal right respondent alleges," *City and County of San Francisco v. Sheehan,* 575 U.S. ——, ——, 135 S.Ct. 1765, 1779, —— L.Ed.2d —— (2015), the weight of that authority at the time of Barkes's death suggested that such a right did *not* exist. *See, e.g., Comstock v. McCrary,* 273 F.3d 693, 702 (6th Cir. 2001) ("the right to medical care for serious medical needs does not encompass the right to be screened correctly for suicidal tendencies"); *Tittle v. Jefferson Cty. Comm'n,* 10 F.3d 1535, 1540 (11th Cir. 1994)(alleged "weaknesses in the [suicide] screening process, the training of deputies[,] and the supervision of prisoners" did not "amount to a showing of deliberate indifference toward the rights of prisoners"); *Burns v. Galveston,* 905 F.2d 100, 104 (5th Cir. 1990) (rejecting the proposition that "the right of detainees to adequate medical care includes an absolute right to psychological screening"); *Belcher v. Oliver,* 898 F.2d 32, 34–35 (4th Cir.

1990) ("The general right of pretrial detainees to receive basic medical care does not place upon jail officials the responsibility to screen every detainee for suicidal tendencies.").

*Id.* at 2044-45. The *Taylor* court went on to hold that the individual defendants at issue were entitled to qualified immunity. *Id.* at 2045.

Similarly, Fifth Circuit precedent provides that "jailers must take measures to prevent inmate suicides," but only "*once they know of the suicide risk*," *Calton v. Livingston,* No. H–09–2507, 2011 WL 2118700, at *16 (S.D. Tex. May 27, 2011) (emphasis added), and there is no clearly-established right to any specific actions jail officials must take, once they know of a suicide risk. *See Jacobs v. West Feliciana Sheriff's Dept.,* 228 F.3d 388, 394–95 (5th Cir. 2000).

In this case, Bland did not have a clearly-established right to any different or more effective implementation of suicide prevention protocols. There is also no evidence that any different or more effective protocols would have prevented her suicide in this case. *See, e.g., Slade v. City of Marshall*, --- F.3d ---, No. 15-40517, 2016 WL 537619 (5th Cir. Feb. 10, 2016) (wrongful death plaintiff asserting section 1983 claims must prove a causal link between the violation of constitutional rights and death, and "must demonstrate that the defendant's wrongful actions more likely than not caused the decedent's death"). Because they did not violate Bland's clearly-established rights, Defendants are entitled to qualified immunity.

iv.  *Qualified Immunity – No Objectively Unreasonable Conduct*.

Next, even if Bland had a clearly established right to the proper implementation of adequate suicide prevention protocols—which is denied, and is contrary to Supreme Court authority from June 2015—Defendants would still be entitled to qualified immunity because their actions were objectively reasonable.

More specifically, the qualified immunity analysis is two-fold; even if there was a violation of a clearly-established right, the governmental actor is still entitled to qualified immunity if his actions were objectively reasonable. *See Freeman v. Gore,* 483 F.3d 404, 410–11 (5th Cir. 2007). Whether an official's conduct was objectively reasonable is a question of law for the court, not a matter of fact for the jury. *Williams v. Bramer,* 180 F.3d 699, 703 (5th Cir. 1999). The Court simply asks whether it would be objectively reasonable for the defendant to believe that his actions were constitutional. *See Lytle v. Bexar County, Tex.,* 560 F.3d 404, 410 (5th Cir. 2009).

At the summary judgment stage, "a plaintiff must present evidence to raise a fact issue 'material to the resolution of the questions whether the defendants acted in an objectively reasonable manner in view of the existing law and facts available to them.'" *Calton v. Livingston,* No. H–09–2507, 2011 WL 2118700, at *15 (S.D. Tex. May 27, 2011) (quoting *Lampkin v. City of Nacogdoches,* 7 F.3d 430, 435 (5th Cir. 1993)). Notably, the Supreme Court has rejected the argument that

conduct that violates even clear state statutes or regulations is "objectively unreasonable;" all that matters is whether the conduct was objectively unreasonable in light of the clearly-established constitutional right at issue. *Davis v. Scherer*, 468 U.S. 183, 194-96 & n.12 (1984) (rejecting lower court's holding that "if an official violates his agency's explicit regulations, which have the force of state law, that is evidence that his conduct is unreasonable.")

In this case, there is no evidence that Defendants' actions were objectively unreasonable. Accordingly, summary judgment is appropriate.

**B.** **Section 1983 Failure to Provide Medical Care Claims Fail as a Matter of Law.**

      *i.*     *No Deliberate Indifference*

Plaintiff claims Defendants were deliberately indifferent to Bland's need for medical treatment after she was found hanging in her cell on Monday morning. However, the evidence establishes that, upon discovering Bland hanging, Whidden used a radio to request immediate access to the cell, Mills immediately opened the cell door, and Defendants went into the cell. Defendants requested immediate EMS assistance, and Defendants immediately assisted in getting Bland down by removing the ligature from which she was hanging, and laid her on the ground so that Lieutenant Rochen could perform CPR. Lieutenant Rochen performed CPR until she was relieved, and EMS personnel took over providing medical care to Bland. EMS personnel pronounced Bland dead shortly thereafter.

Defendants did not ignore Bland or fail to provide treatment—to the contrary, they provided emergency treatment immediately upon learning of Bland's need for same—and they had no subjective awareness that any other or different treatment was appropriate or needed. *See, e.g., Estate of Pollard v. Hood County*, Cause No. 13-11060, 579 Fed.Appx. 260, 263, 267 (5th Cir. Aug. 25, 2014) (when detainee discovered hanging, there is no deliberate indifference to check for pulse, and leave detainee hanging when no pulse found); *Estate of Schroeder v. Gillespie County*, 23 F.Supp.3d 775, 785 (W.D.Tex. 2014) (when detainee discovered hanging, there is no deliberate indifference to cut him down, call for EMS, and perform CPR until EMS arrives). Accordingly, Defendants were not deliberately indifferent to any serious medical need, and this claim fails as a matter of law.

### ii.   *Qualified Immunity.*

Defendants are also entitled to qualified immunity on this claim because there is no evidence that any of their actions with respect to any alleged lack of medical care after Bland was discovered hanging violated any clearly-established constitutional rights, or were objectively unreasonable.

## C.   *Negligence Claims.*

Negligent acts and omissions are categorically below the threshold of constitutional torts. Nonetheless, Plaintiff asserts negligence claims against

Defendants, alleging that they (1) failed to adequately monitor Sandra Bland to keep her safe and secure, (2) failed to keep her free from injury, (3) failed to keep her in a safe and suitable environment, (4) failed to provide adequate medical care after she was found hanging, and (5) failed to transport her to a medical facility after she was found hanging. As set forth below, however, these state-law claims must be dismissed under the Texas Tort Claims Act ("TTCA").

The TTCA contains an election of remedies provision, which forces a plaintiff to elect whether to assert claims against a governmental unit, or its employees. TEX. CIV. PRAC. & REM. CODE § 101.106. Where a plaintiff files suit against both a governmental unit and its employees, "the employees shall immediately be dismissed on the filing of a motion by the governmental unit." *Id.* at (e). In this case, Plaintiff asserts negligence claims against Defendants, and against their governmental employer, Waller County. Although Waller County has already filed a motion for summary judgment in this case, Waller County joins in this motion for the purpose of moving for dismissal of the state-law tort claims against Defendants, pursuant to the TTCA's election of remedies provision.

Even if Defendants' immunity had been waived—which is denied— Plaintiff's negligence claims against them would nonetheless fail as a matter of law because they did not owe or breach any duty to Bland, and because they are

entitled to official immunity for the reasons set forth in the discussion above relating to qualified immunity.

## VII.
### PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendants RAFAEL ZUNIGA, MICHAEL SERGES, DORMIC SMITH, CYNTHIA WHIDDEN, and MATTHEW MILLS pray that their Motion for Summary Judgment be granted, that Plaintiff's section 1983 claims be dismissed with prejudice, that her negligence claims be dismissed for lack of subject matter jurisdiction, that all costs be borne by the party incurring same, and for such other and further relief to which Defendants may be justly entitled.

Respectfully submitted,

_Larry J. Simmons_

**Larry J. Simmons – Attorney-in-Charge**
State Bar No. 00789628
Southern District of Texas No. 18830
**B. Eliot New – Of Counsel**
State Bar No. 24060328
Southern District of Texas No. 884608
**GERMER PLLC**
P.O. Box 4915
Beaumont, TX 77704
(409) 654-6700 – Telephone
(409) 835-2115 – Facsimile

**COUNSEL FOR DEFENDANTS,
RAFAEL ZUNIGA, MICHAEL SERGES,
DORMIC SMITH, CYNTHIA WHIDDEN, AND
MATTHEW MILLS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of **Defendants Rafael Zuniga, Michael Serges, Dormic Smith, Cynthia Whidden, and Matthew Mills' Motion for Summary Judgment** has been forwarded to all known counsel of record pursuant to the Federal Rules of Civil Procedure on this the 17th day of May 2016.

_Larry J. Simmons_

**Larry J. Simmons**